**James E. MITCHELL and James Nichols, Jr., Petitioners-Appellants,**

**v.**

**Jim ROSE, Warden, Respondent-Appellee.**

No. 77–1272.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 14, 1977.

Decided Jan. 9, 1978.

Walter C. Kurtz, Legal Services of Nashville (Court appointed), James E. Mitchell, James Nichols, Jr., Nashville, Tenn., for petitioners-appellants.

Brooks McLemore, Jr., Atty. Gen. of Tenn., Michael E. Terry, Asst. Atty. Gen., Nashville, Tenn., for respondent-appellee.

Before PHILLIPS, Chief Judge, PECK, Circuit Judge, and GRAY, Senior District Judge.*

* Honorable Frank Gray, Jr., United States District Court for the Middle District of Tennessee, sitting by designation.

JOHN W. PECK, Circuit Judge.

On November 6, 1972, Petitioners James Mitchell and James Nichols, Jr., were indicted for two counts of first degree murder by the Tipton County, Tennessee grand jury. On March 22, 1973, they were found guilty after a jury trial.

Prior to the trial, petitioners filed a pro se motion, asking the trial court to dismiss the indictment because the grand jury and the foreman of the grand jury which indicted them had been selected in a racially discriminatory manner. A pretrial hearing was held and the trial judge, making no written or oral findings of fact or rulings of law, entered an order which stated in full: "Plea in abatement is overruled."

The ruling was upheld in the Tennessee Court of Criminal Appeals on the grounds that racial discrimination had not been proved, and certiorari to the Tennessee Supreme Court was denied. Petitioners then turned to the federal courts for relief, filing pro se petitions for writs of habeas corpus in the United States District Court for the Western District of Tennessee.

The district judge denied an evidentiary hearing, and ruled that

the question of racial discrimination in the selection of the grand jury was adequately investigated and that the state trial judge, in ruling that no discrimination had been shown in the selection of the grand jury made the correct decision on the record before him.

The district judge went on to hold, however, that a prima facie case had been made with respect to the foreman issue, and ordered the state to make further response.

The state submitted two affidavits. The foreman of the grand jury which indicted the petitioners stated that he had not voted on the indictments, and that petitioners were indicted after the grand jury had heard only one witness. The judge who had appointed the foreman also submitted an affidavit, stating, "We called Mr. Smith [the foreman] because he has been willing to act in the past and has experience and does a good job as such foreman." The trial judge's affidavit continued:

In my five counties, I do not have a black grand jury foreman, although I have a black member of my Jury Commission in one county. Most all of my Grand Juries and Petit Juries have sizeable numbers of blacks on them, both men and women. I don't appoint Grand Jury Foremen very often because when their two year term expires, I usually reappoint them, thus they serve a long time and the problem doesn't come up very often. I don't think that I have really given any thought to appointing a black foreman but I have no feeling against doing so.

On the basis of these affidavits, the district court ordered the dismissal of the petitions for habeas corpus relief, stating:

[N]o racial discrimination in the composition of the grand jury has been shown. On the contrary, it appears that one black person actually served on the grand jury that indicted these petitioners, that the foreman was selected for other than racial reasons, and that the foreman did not vote at the time the indictment was rendered.

The petitioners have appealed that order, contending that they have made out a prima facie case of discrimination in the selection both of the grand jury and of the foreman, which the State of Tennessee has not adequately rebutted. In the alternative, they argue that they have a right to an evidentiary hearing in the district court to further develop the facts.

I

Tennessee uses the "key man" system of jury selection, relying on three jury commissioners appointed by the trial judge to select a pool of prospective grand jurors from the general population. Tenn. Code Ann. § 22–223. Every two years, the commissioners meet to select names "from the tax records and permanent registration records of the county, or other available and reliable sources," § 22–228. The number of names are determined by the judge. The names are recorded officially in a jury list book, § 22–228(a), then written on cards,

sealed in a box, and drawn at random as needed for jury service. The same list serves as jury pool for both grand and petit juries.

The commissioners have a duty to propose a "list of names of upright and intelligent persons known for their integrity, fair character and sound judgment." § 22–228. The basic statutory qualifications for jury service are that a juror must be at least eighteen years old, a United States citizen and a resident of the county in which he or she serves as juror. § 22–201. In addition, persons convicted of "infamous offenses," of unsound mind, with deficient sight or hearing, or habitually drunk are disqualified. Persons in certain exempt occupations or who would suffer hardship if they served are excused.

The foreman or forewoman of the grand jury is selected in an entirely different manner. In essence, they are hand-picked by the trial judge from the eligible population for a two-year appointment. § 40–1506. They are subject to the same statutory qualifications as jurors except that they must be at least twenty-five years old.

II

The facts elicited at the pretrial hearing were meager, especially as to hard figures or even substantiated estimates of the racial makeup of Tipton County grand juries. For instance, there is no indication in the record of the total number of persons in the jury pool, nor is there any indication of the racial makeup of the pool. However, some relevant information may be gleaned from the record.

In 1972, the jury commissioners in Tipton County were three men, all white. The November, 1972 grand jury was selected from the jury pool chosen two years earlier. Names were selected from the local telephone directory,[1] and all three commissioners testified that they selected names only of persons they knew, either personally or by reputation, and that they were aware of their duty to select, without prejudice, black members of the community.

■ Very few statistics were mentioned at the hearing, although one commissioner testified that he thought the county was about 30% black. (The 1970 Census shows that Tipton County was 32.4% black.)[2] Neither the total number of names in the jury pool, nor the number of blacks was established, though it is significant that the state could easily have done so. This would prove beyond a doubt that there was no discrimination, if such were true, since a jury list book is a statutory requirement, and since the commissioners are acquainted with everyone on the list. However, three prior foremen did testify in vague terms about the representation of blacks on the juries themselves.

The three of them had served off and on as grand jury foremen since the early

---

1. Petitioners have challenged the use of the telephone directory as a source of names for jury service. The use of phone books has been upheld in the past, *Gebhard v. United States*, 422 F.2d 281 (9th Cir. 1970), but petitioners, relying on census data, have made a showing that 44.3 percent of Tipton County black households are without telephone service while only 20.7 percent of white households are without such service. The use of voting lists with such disparities has been upheld, but on the grounds that registering to vote is a voluntary act which is reasonable to require of jurors. We need not decide whether obtaining telephone service is a similar voluntary act, but note that the Supreme Court, reversing a district court's finding of no discrimination, has held that

> the court should not have passed without response the commissioners' elimination

from consideration for jury service of about 9% of the population of the entire county. In the face of the commissioners' unfamiliarity with Negroes in the community and the informality of the arrangement by which they sought to remedy the deficiency in their knowledge upon recompiling the jury list, we cannot assume that inquiry would not have led to the discovery of many qualified Negroes.

*Turner v. Fouche*, 396 U.S. 346, 360, 90 S.Ct. 532, 540, 24 L.Ed.2d 567 (1970).

2. The courts may take judicial notice of census figures, absent a showing that they are unreliable for some reason. *Goins v. Allgood*, 391 F.2d 692 (5th Cir. 1968); *cf., Castaneda v. Partida*, 430 U.S. 482, 487–488, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977).

1950's. None of them could recall a black foreman or forewoman. However, each testified that blacks had served on their grand juries, remembering "several," "some," "probably three or four," "usually two or three," and one black woman on the November, 1972 grand jury that indicted the petitioners.[3]

### III

The fundamental rules to be applied in cases charging grand jury discrimination are well established. For almost a century it has been settled law that if a state chooses to use grand juries to return indictments, the jurors must be selected without discrimination because of race or color. In 1879, in its landmark trilogy of cases establishing the right of blacks to serve on juries and grand juries, and the right of every accused citizen to an indictment by a grand jury selected without discrimination, the Supreme Court pointed out:

> It is not easy to comprehend how it can be said that while every white man is entitled to a trial by a jury . . . selected without discrimination against his color, and a negro is not, the latter is equally protected by the law with the former. Is not protection of life and liberty against race or color prejudice a right, a legal right, under the constitutional amendment? And how can it be maintained that compelling a colored man to submit to a trial for his life by a jury drawn from a panel from which the State has expressly excluded every man of his race, because of color alone, however well qualified in other respects, is not a denial to him of equal legal protection?

*Strauder v. West Virginia*, 100 U.S. 303, 309, 25 L.Ed. 664 (1879). Substantial underrepresentation, as a result of purposeful discrimination, is as much a constitutional violation as total exclusion. *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *Turner v. Fouche*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970).

There seems to be a common misconception, exemplified by the trial judge's comments at the evidentiary hearing, the district court's opinion dismissing the petition, and respondent's brief, that constitutional requirements are met if there are simply "some" blacks on grand juries. This is probably due to frequent judicial statements that there is no requirement for any particular jury panel to contain blacks, and that the venire need not contain the names of blacks in the same proportion as they are to be found in the general population. Both these statements are quite true; however, they are true because both may occur without discrimination against blacks. However large a percentage of the jury pool is black, any single jury, randomly drawn, may be all white (or, for that matter, all black). Also, neutral legitimate requirements imposed by the state on its jurors may weigh more heavily on one race than another, resulting in percentages different from those in the general population. Whether the presence of a few blacks on grand juries over the years is evidence tending to prove or disprove racial discrimination depends on the proportions of blacks who are qualified for jury service.

The method of establishing a prima facie case of intentional discrimination is also well-established when, as here, the alleged discrimination is aimed at blacks. If over a significant period of time there exists a substantial disparity between the proportion of blacks in the general population, and the proportion called to serve as grand jurors,[4] and the selection procedure affords

---

3. The state presented no rebuttal except the testimony of the Circuit Court Clerk, who agreed with the prosecutor's comment that there had been "a very substantial number of members of the Negro race" on petit and grand juries.

4. In most reported cases thus far, this statistical analysis has been largely intuitive, based on rough impressions about probabilities. However, given accurate data, the probability that racial results are due to chance can be analyzed mathematically and either affirmed or rebutted with considerable accuracy. For instance, in *Castaneda, supra*, 430 U.S. 482, 97

an opportunity to discriminate or is not racially neutral,[5] then the defendant has made out a prima facie case, and the burden shifts to the state to rebut the case. *Castaneda, supra,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498; *Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972).

■■■■ Once the burden has shifted to the state, it may rebut the prima facie case in several ways. The state may impose any reasonable qualifications it wishes on its grand jurors; for instance, it may require that they be literate, that they not be convicted felons, or that they be registered voters. The neutral imposition of any of these requirements may *possibly* result in the exclusion of more members of one race than another. "There are many possible circumstances which, if they exist here, might account lawfully for the observed disparity. The suggestion of their possible existence is not enough, however." *Stephens v. Cox,* 449 F.2d 657 (4th Cir. 1971). The state must present some concrete evidence of the effect of its neutral requirements, not merely present to the court unfounded suppositions about the literacy, intelligence and good character of its black citizens.[6] Finally, it should be noted that self-serving protestations from the officials involved that racial considerations played

no part in the selection are not enough to rebut a prima facie case. *Castaneda, supra,* 430 U.S. at 498 n. 19, 97 S.Ct. 1272; *Alexander v. Louisiana, supra,* 405 U.S. at 632, 92 S.Ct. 1221.

## IV

Applying these principles to the grand jury selection in this case is difficult because of the vague nature of the data available. Accepting as true the testimony of the grand jury foremen at the pretrial hearing, over the last quarter-century there has been at least one grand jury which was less than 8 percent (one in thirteen) and one which was nearly 31 percent black (four in thirteen). These figures do not help us, however, because there is no way to tell from the record what average percentage of all the grand juries over those years was black, the only statistic which would help to prove or disprove the existence of discrimination.

■■■■ We need neither depend on questionable estimates nor remand for a time-consuming hearing,[7] however, because there is no guesswork about the figures in the second aspect of petitioners' case. There has never been a black foreman or forewoman of a grand jury in Tipton County according to the recollections of the trial

S.Ct. 1272, 51 L.Ed.2d 498, with a 79.1% Mexican-American population and 39% Mexican-American grand jurors over a period of eleven years, the Supreme Court could determine that the chances of such a result occurring without racial discrimination were less than one in ten to the 140th power, and thus could be described as impossible. *See* Finkelstein, *The Application of Statistical Decision Theory to the Jury Discrimination Cases,* 80 Harv.L.Rev. 338 (1966). Statisticians generally reject the possibility that a particular result is due to chance when the probability of that result occurring by chance is less than one in twenty. *Id.* at 359. We need not decide today at what point the courts should similarly reject an assertion that a particular racial result is due to chance rather than discrimination.

5. While the facial constitutionality of the keyman system has been upheld, it has been frequently recognized as a method particularly subject to abuse, and therefore subject to close scrutiny by the courts. We note, as has the

Supreme Court on numerous occasions, that random selection methods similar to the federal system would avoid most of the potential for abuse found in the key man system, and would probably eliminate challenges such as the State of Tennessee faces here. *Castaneda, supra,* 430 U.S. at 497 n. 18, 97 S.Ct. 1272.

6. *See Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970), in which the Supreme Court rejected the state's attempt to explain the disparity in black representation on juries by arguing, without substantiation, that many blacks were not "upright" or "intelligent" enough to serve.

7. In *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), the Supreme Court held that an evidentiary hearing must be held on an application for federal habeas corpus relief "unless the state-court trier of facts has after a full hearing reliably found the relevant facts." *Id.,* at 313, 83 S.Ct. at 757.

judge, three jury commissioners, and three former foremen. The statutory qualifications are identical to those of jurors except that foremen or forewomen must be a few years older. The position is filled by the trial judge from the general population, thus affording ample opportunity for discrimination, whether conscious or unconscious. While discrimination must be "intended," officials who select grand jurors must be considered to have intended the natural results which flow from their conduct. *Rabinowitz v. United States*, 366 F.2d 34 (5th Cir. 1966). Thus a judge who "never really gave any thought" to appointing a black is discriminating just as surely as were the jury commissioners who never selected blacks because their names were "never discussed," *Norris v. Alabama*, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935), or because they didn't know any blacks, *Turner v. Fouche*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). Officials who select grand jurors have a duty to learn who is qualified to fill the position of grand juror, and to consider qualified individuals from all segments of society. Failure to perform that duty, resulting in the exclusion of a qualified segment of society, is unconstitutional discrimination. *Turner, supra*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567.

■ Thus the petitioners clearly established a prima facie case of racial discrimination in the appointment of grand jury foremen and forewomen. The state presented no rebuttal to this case at the hearing, but in response to the district court's request for a further answer to this prima facie case, submitted the two affidavits described above. In dismissing the petitions, the district judge stated that the foreman was "selected for other than racial reasons, and . . . did not vote at the time the indictment was rendered." Thus we must decide whether, as the district court ruled, the state has successfully rebutted the prima facie case.

■ Perhaps understandably, it appears that the district court has given undue weight to the exculpatory affidavit of the trial judge. In *Alexander v. Louisiana*, *supra*, 405 U.S. 625, 632, 92 S.Ct. 1221, 31 L.Ed.2d 536, the Supreme Court pointed out that

the clerk of the court, who was also a member of the jury commission, testified that no consideration was given to race during the selection procedure. App. 34. The Court has squarely held, however, that affirmations of good faith in making individual selections are insufficient to dispel a prima facie case of systematic exclusion. *Turner v. Fouche, supra* [396 U.S.], at 361 [90 S.Ct. 532]; *Jones v. Georgia*, 389 U.S. 24, 25 [88 S.Ct. 4, 19 L.Ed.2d 25] (1967), *Sims v. Georgia*, 389 U.S. 404, 407 (1967). "The result bespeaks discrimination, whether or not it was a conscious decision on the part of any individual jury commissioner." *Hernandez v. Texas*, 347 U.S. [475], at 482 [74 S.Ct. 667, 98 L.Ed. 866]. . . . The commissioners, in any event, had a duty "not to pursue a course of conduct in the administration of their office which would operate to discriminate in the selection of jurors on racial grounds." *Hill v. Texas*, 316 U.S. 400, 404 [62 S.Ct. 1159, 86 L.Ed. 1559] (1942).

An absence of blacks qualified to serve as foremen or forewomen has not been demonstrated or even suggested; thus there has been no rebuttal of petitioners' prima facie case.

■ The fact that the foreman did not vote on petitioners' indictments also fails to support the district court's dismissal. Consideration of this factor is closely linked to the final, implicit question in this appeal: whether proof of discrimination in the selection of a grand jury foreman mandates the same remedy as does proof of discrimination in the selection of the grand jury. Normally, if the state fails to successfully rebut a prima facie case of discrimination, a writ of habeas corpus must issue, since the indictment and all proceedings on that indictment are void. *See Castaneda*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498. There is no need for the petitioner to show prejudice, and a showing of no prejudice by the state is no defense. *Hill v. Texas*, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942).

The question is whether the same result is required when there is discrimination shown only in the selection of the grand jury foreman. While the parties did not brief this issue, it is necessary that we consider it since the district court apparently relied on a finding of no prejudice, pointing out that the foreman rendered no vote on the indictment.

■ In 1973, this Court held on facts similar to those here that no discrimination had been proved because the particular foreman in question had not been appointed in the usual fashion, but selected in an emergency from among the grand jurors. There was no challenge to the makeup of the grand jury panel. Thus the defendant could not rely on proof of past absence of blacks from the foreman position, along with a selection process susceptible to abuse, because the foreman in that case had not been selected in the same manner. *Hale v. Henderson,* 485 F.2d 266 (6th Cir. 1973), *cert. denied,* 415 U.S. 930, 94 S.Ct. 1442, 39 L.Ed.2d 489 (1974). Not inconsistent with that opinion, we hold today that where a prima facie case of discrimination in the selection of grand jury foremen has been established, and has not been rebutted, "the conviction cannot stand, because the Constitution prohibits the procedure by which it was obtained." *Hill v. Texas, supra,* 316 U.S. at 406, 62 S.Ct. at 1162.

The foreman or forewoman is vitally important to the functioning of grand juries in Tennessee, being "the thirteenth member of each grand jury organized during his term of office, having equal power and authority in all matters coming before the grand jury with the other members thereof." Tenn.Code Ann. § 40–1506. He or she is expected to assist the district attorney in investigating crime, may administer oaths to all witnesses, conduct the questioning of witnesses, must indorse and sign all indictments,[8] and like every other chairperson is in a position to guide, whether properly or improperly, the decision-making process of the body. Additionally, the indorsement and signature of the foreman or forewoman is indispensible to an indictment in Tennessee, and their absence voids the bill. *Bird v. State,* 103 Tenn. 343, 52 S.W. 1076 (1876).

In any case, even without these important duties and powers, the foreman or forewoman is a full member of the grand jury, and we agree with the district court in *Hale v. Henderson,* 336 F.Supp. 512 (W.D. Tenn.1972), that a grand jury which is only twelve-thirteenths constitutional cannot render constitutionally valid indictments.

It seems clear that the potential for prejudice, given the position of authority and influence the foreman or forewoman holds, is considerable, and in such cases where the fact of prejudice may be impossible to prove, yet its effect could be so insidious and far-reaching, the courts have refused to require proof of prejudice before granting relief.

■ However, it is not simply the possibility of prejudice to a criminal defendant that mandates the reversal of convictions based on unconstitutional indictments. In

---

8. *See* Tenn.Code Ann.,

§ 40–1510. Duties of foremen or forewomen.—It shall be the duty of such foremen or forewomen of grand juries to assist and cooperate with the district attorney in ferreting out crime, to the end that the laws may be faithfully enforced; and such foremen or forewomen are directed out of term to advise the district attorney with respect to law violations and furnish him names of witnesses, whom the district attorney may, if he deem proper, order summoned to go before the grand jury at the next term. In term time, the foreman or forewoman may order the issuance of subpoenas for witnesses to go before the grand jury, unless otherwise ordered by the district attorney.

§ 40–1622. Power of foreman to administer oath.—The foreman of the grand jury shall have power to administer oaths to all witnesses brought before the grand jury to testify as to the violations of the criminal laws in all cases where the clerks of the criminal and circuit courts may administer said oath.

§ 40–1706. Concurrence in true bill.—An indictment cannot be found without the concurrence of at least twelve (12) grand jurors, and, when so found, shall be indorsed "A true bill," and the indorsement signed by the foreman.

§ 40–1709. Presentation of indictment.—An indictment, when found by the grand jury, and indorsed as prescribed by this chapter, shall be presented by the foreman, in their presence, to the court, and filed by the clerk.

fact, it is quite clear that a constitutional indictment may be returned by an all-white or an all-black grand jury, and the possibility of prejudice is no less if such a jury makeup occurred by chance rather than by design. Even a white defendant has standing to challenge a grand jury selection process which systematically excludes blacks. *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972). Many years ago it was recognized that the injury is more subtle, and runs deeper than direct racial prejudice against the defendant:

> [R]eversible error does not depend on a showing of prejudice in an individual case. The evil lies in the admitted exclusion of an eligible class or group in the community in disregard of the prescribed standards of jury selection. . . . The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts.

*Ballard v. United States*, 329 U.S. 187, 195, 67 S.Ct. 261, 265, 91 L.Ed. 181 (1946).

In *Peters v. Kiff, supra*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83, the state opposed the issuance of the writ to a white prisoner, arguing that

> even if the grand and petit juries were unconstitutionally selected, petitioner is not entitled to relief on that account because he has not shown how he was harmed by the error. It is argued that a Negro defendant's right to challenge the exclusion of Negroes from jury service rests on a presumption that a jury so constituted will be prejudiced against him; that no such presumption is available to a white defendant; and consequently that a white defendant must introduce affirmative evidence of actual harm in order to establish a basis for relief.

*Id.* at 498, 92 S.Ct. at 2166. The Supreme Court expressly rejected this argument, holding that such discrimination by its very existence denies a defendant due process of law:

> [A] State cannot, consistent with due process, subject a defendant to indictment or trial by a jury that has been selected in an arbitrary and discriminatory manner, in violation of the Constitution and laws of the United States. Illegal and unconstitutional jury selection procedures cast doubt on the integrity of the whole judicial process.

The necessary remedy in such a case is also clear:

> [N]o State is at liberty to impose upon one charged with crime a discrimination in its trial procedure which the Constitution, and an Act of Congress passed pursuant to the Constitution, alike forbid. . . . [I]t is our duty as well as the State's to see to it that throughout the procedure for bringing him to justice he shall enjoy the protection which the Constitution guarantees. Where, as in this case, timely objection has laid bare a discrimination in the selection of grand jurors, the conviction cannot stand, because the Constitution prohibits the procedure by which it was obtained.

*Hill v. Texas*, 316 U.S. 400, 406, 62 S.Ct. 1159, 1162, 86 L.Ed. 1559 (1942).

It is therefore ordered that the cause be remanded to the district court for entry of an order providing that petitioners' convictions be set aside, and that within sixty days the petitioners be reindicted, failing which the writ of habeas corpus shall be made absolute and petitioners released from custody.